IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TERAP SEID,<br><br>                 Plaintiff,<br><br>v.<br><br>UNIVERSITY OF UTAH, RUTH WATKINS, CYNTHIA BERG, and THOMAS MALONEY,<br><br>                 Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS**<br><br>Case No. 2:19-cv-00112<br><br>District Judge Jill N. Parrish |

Defendants University of Utah, Ruth Watkins, Cynthia Berg, and Thomas Maloney (collectively, "Defendants") move to dismiss plaintiff Terap Seid's ("Plaintiff") Amended Complaint for failure to state a claim. Plaintiff alleges that he was subjected to racial discrimination and deprived of his right to procedural due process when he was dismissed from a Ph.D. Economics program at the University of Utah. Having considered the parties' briefs, the court grants the Defendants' Motion and dismisses Plaintiff's Amended Complaint.

## I.  BACKGROUND

### A.  FACTUAL BACKGROUND

At the time of the events giving rise to this lawsuit, Plaintiff was a graduate Ph.D. student in the Department of Economics (the "Department") at the University of Utah (the "University"). Plaintiff is a native of Chad, identifies as African American, and is a native French speaker. Am. Compl. ¶ 17. He previously received a Bachelor's degree in finance and Master's degree in Economics from the University. *Id.* ¶¶ 18–22. Plaintiff then enrolled in the University's graduate Ph.D. program. *Id.* ¶¶ 23–24.

In October 2015, the Department informed Plaintiff that he had to take three qualifying examinations in Political Economy, Macroeconomics, and Microeconomics, and "score at least one pass and two marginals" on the exams to advance in the Ph.D. program. *Id.* ¶¶ 28, 34–35. Plaintiff disagreed that he needed to take and pass the qualifying examinations given his prior education and experience and believed that the Department imposed the requirement on him because of discrimination. *Id.* ¶ 29. Accordingly, Plaintiff filed two complaints of discrimination concerning the qualifying examinations requirement and other purported discriminatory treatment that he experienced in the Department with the University's Office of Equal Opportunity and Affirmative Action ("OEO/AA").[1] *Id.* ¶¶ 30, 32. The University, through its Associate General Counsel, dismissed both of Plaintiff's complaints, writing on February 24, 2016 that Plaintiff "failed to state a cognizable claim" of discrimination and on June 26, 2016 that Plaintiff's concerns appeared to be "academic and/or departmental issues rather than issues of discrimination." *Id.* ¶¶ 31, 33. Plaintiff then took the qualifying examinations on two occasions, but he twice failed to obtain the scores required to remain in the Ph.D. program. *Id.* ¶¶ 36, 69.[2] On July 11, 2016, the Department informed Plaintiff that he would be dismissed from the program because of his failure to pass all three of the exams. *See id.*

On August 14, 2016, Plaintiff appealed his dismissal from the program by filing a Petition for Continuation in the Ph.D. program with Dr. Thomas N. Maloney, Chair of the Department of

---

[1] Plaintiff also states that he filed a third complaint of discrimination with the OEO/AA on May 5, 2013, but he does not provide any details about its contents or the University's handling of the complaint. *See* Am. Compl. ¶ 30. Thus, the court does not consider Plaintiff's third OEO/AA complaint.

[2] Plaintiff "alleges that he took the qualifying examinations at issue twice" and the Department "informed him twice that he had not passed the qualifying exams." Am. Compl. ¶ 69. However, his Amended Complaint does not state when Plaintiff took the examinations or whether his August 14, 2016 appeal to Dr. Maloney was in regard to his first or second attempt, or both.

Economics. *Id.* ¶ 37. Chair Maloney affirmed that Plaintiff had been dismissed from the Ph.D. program for failing to comply with the qualifying examinations requirement. *Id.* ¶ 38. Plaintiff then filed an administrative appeal of his dismissal to Cynthia Berg, Dean of the College of Social and Behavioral Sciences ("CSBS") on September 7, 2016. *Id.* ¶ 39. Plaintiff "requested [that Dean Berg] make exception to the [exam] policy to allow [him] to repeat exam [sic] and courses with other teachers." *Id.* Dean Berg affirmed Chair Maloney's decision to dismiss Plaintiff from the Ph.D. program. *Id.* ¶ 40.

Plaintiff then appealed through a different channel to the CSBS Academic Appeals Committee (the "Committee"). *Id.* ¶ 41–42. On December 1, 2016, the Committee held a hearing with Plaintiff to consider whether the Department should "waive its qualifying exam requirement" for his Ph.D. candidacy and whether he "experienced discrimination by faculty in the Economics Department." *Id.* ¶ 43. In a December 8, 2016 letter, the Committee informed Plaintiff that it unanimously voted to reject his request to waive the qualifying exams requirement. *Id.* ¶ 45. But the Committee recommended to the Department that it should allow Plaintiff to retake the examinations for a third time in a manner that would enable a "genuinely blind evaluation of [his] examinations, with a clear conclusion." *Id.* ¶ 50. For example, the "Committee recommend[ed] that the exams be typed" rather than handwritten and that the Plaintiff's new exam answers should be "submitted to additional reviewers." *Id.* The Committee also found that some of Plaintiff's allegations concerning discrimination by faculty in the Economics Department were "troubling" and that his "possible unfair treatment . . . may reflect personal animus or systemic discrimination toward" him. *Id.* ¶ 46–47. The Committee recommended that Plaintiff meet with the University's OEO/AA to discuss his allegations of discriminatory treatment. *Id.* ¶ 48.

In a December 19, 2016 letter, however, Dean Berg rejected the Committee's recommendation to allow Plaintiff to retake the qualifying examinations and further explore his allegations of discrimination by the Department. *Id.* ¶ 51. Dean Berg rejected this course of action because she concluded that the OEO/AA had previously investigated and dismissed Plaintiff's complaints of discriminatory treatment and he had already taken and failed the examinations twice. *Id.* ¶ 52–53. On December 27, 2016, Plaintiff further appealed Dean Berg's decision to Ruth Watkins, Senior Vice President for Academic Affairs. *Id.* ¶ 56. On January 10, 2017, Senior Vice President Watkins responded to Plaintiff's appeal and denied any further review of his requests, stating that such review would only occur "in an extraordinary case, *i.e.*, one in which it is clear that an outside factor had influenced the [initial] review." *Id.* ¶ 57. Senior Vice President Watkins explained that Plaintiff's assertions "that those who graded [his] exams were biased in any way" had already "been reviewed and found without basis by the OEO[/AA]" and he had presented "no evidence outside" of those prior assertions to warrant additional review. *Id.*

On February 28, 2017, Plaintiff filed a complaint of discrimination against the Department with the United States Department of Education's Office for Civil Rights ("OCR"). *Id.* ¶ 61. In late March 2017, he also sent a letter to the OCR to provide additional facts about his claims. *Id.* On May 5, 2017, the OCR dismissed Plaintiff's allegations. *See id.* ¶ 62. First, the OCR ruled that Plaintiff's allegations of discriminatory actions or decisions that occurred prior to September 2, 2016, were time-barred. *Id.* Second, for the allegations concerning incidents after September 2, 2016, the OCR stated that the "information . . . provided is insufficient for OCR to infer that discrimination may have occurred." *Id.* The OCR also informed Plaintiff of his right to sue. *Id.*

## B. PARTIES' ARGUMENTS

Plaintiff commenced this lawsuit on August 22, 2019, alleging two causes of action. First, Plaintiff alleges that Defendants violated his rights to be free from discrimination based on race,

color, and national origin under Title VI of the Civil Rights Act of 1964. Plaintiff asserts that Defendants discriminated against him because they unnecessarily required him to take the exams even though he had prior degrees from the University and "had already largely completed all the course work for the Ph.D. program." *Id.* ¶ 65. Plaintiff separately argues that "the way the Department administered the examinations" also violated Title VI because his exam answers had to be handwritten in English and he is a native French speaker. *Id.* ¶ 71. Plaintiff alleges that Defendants' "failure . . . to provide methods of bridging the language gap and especially the language/handwriting gap" discriminated against him by inhibiting his ability to "demonstrate his proficiency in the subject matters covered in the examinations." *Id.* Second, Plaintiff alleges under Section 1983 that the qualifying examinations requirement and the way in which the Defendants "supervised the administration and grading of the qualifying examinations constituted state action" that deprived him of his right to due process and equal protection of the law. *Id.* ¶ 77.

Defendants argue that Plaintiff's Amended Complaint should be dismissed for four reasons. First, Defendants state that Plaintiff failed to state a plausible Title VI violation "because he has not alleged facts demonstrating discriminatory intent or motive." ECF No. 26 at 2. Second, Defendants contend that the Eleventh Amendment's guarantee of state sovereign immunity prohibits Plaintiff from bringing claims for damages against the University as well as the individual defendants in their official capacities. *Id.* Third, Defendants argue that Plaintiff did not sufficiently plead his claims against the individual defendants "because he has not alleged personal participation by any of them in a specific constitutional violation." *Id.* at 13. Finally, Defendants assert that the individual defendants are entitled to qualified immunity on Plaintiffs' Section 1983 Fourteenth Amendment claims because he received due process and did not experience intentional discrimination. *See id.* at 17–18.

## II.     LEGAL STANDARD

Defendants move to dismiss Plaintiff's Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), that "is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty.*, 771 F.3d 697, 700 (10th Cir. 2014) (quoting *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013). The court's function "is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187 (10th Cir. 2003) (citation omitted). But "general assertions of discrimination . . . are insufficient to survive a motion to dismiss." *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012).

## III.     ANALYSIS

Plaintiff claims that he was discriminated against based on his race, ethnicity, and national origin and deprived of procedural due process when he was dismissed from the Ph.D. program for failing to score proficiently on three qualifying examinations. He argues that both the qualifying examinations requirement itself and the way in which Defendants administered the requirement were unlawfully discriminatory under Title VI and the Fourteenth Amendment's Equal Protection Clause. Moreover, he argues that Defendants failed to provide him with adequate procedural due process under the Fourteenth Amendment when he was dismissed from the Ph.D. Economics program. The court dismisses Plaintiff's Title VI and Equal Protection Clause claims because

Plaintiff failed to state sufficient facts to plausibly plead that he received disparate treatment as compared to similarly-situated peers in the Ph.D. program. The court dismisses Plaintiff's procedural due process claims because he failed to plausibly allege that Defendants provided him with a constitutionally deficient process when he was dismissed from the Ph.D. program.

### A.  TITLE VI CLAIMS

Title VI of the 1964 Civil Rights Act provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity    receiving    Federal    financial    assistance.

42 U.S.C. § 2000d. Congress enacted Title VI "to halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution." *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 284 (1978). But the Supreme Court has determined that, contrary to other provisions in the 1964 Civil Rights Act, Title VI "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Although federal regulations enforcing Title VI's equality requirements target programs that perpetuate discrimination through their disparate impact on minority groups, those regulations "do[] not include a private right [of] enforce[ment]" under Title VI. *Id.* at 285.[3] Thus, to state a claim under Title VI, a claimant must

---

[3] In some instances, plaintiffs may use Section 1983 to enforce other statutory rights that do not themselves provide a private cause of action. *See Maine v. Thiboutot*, 448 U.S. 1, 6–8 (1980) (holding that Section 1983 provides a remedy for deprivations under color of state law of "any rights . . . secured by the Constitution and laws," including statutory rights). In Justice Stevens's dissent in *Sandoval*, he stated that the majority opinion did not foreclose Title VI plaintiffs from seeking to enforce the statute's disparate impact regulations under a Section 1983 claim. *See* 532 U.S. at 300 (Stevens, J., dissenting) (observing that "[l]itigants who in the future wish to enforce the Title VI regulations against state actors in all likelihood must only reference § 1983 to obtain relief"). Soon after *Sandoval*, the Tenth Circuit in *Robinson v. Kansas* appears to have adopted Justice Steven's view by twice noting that the plaintiff in that case could have brought a Section 1983 claim to enforce a disparate impact theory of Title VI liability. *See* 295 F.3d 1183, 1187, 1188 n.7 (10th Cir. 2002), *abrogated on other grounds by Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012). However, the court has found no decision within the Tenth Circuit

allege: "(1) that there is [intentional] racial or national origin discrimination and (2) the entity engaging in discrimination is receiving federal financial assistance." *Baker v. Bd. of Regents of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993) (citation omitted); *see also Irwin v. Bd. of Regents for Oklahoma Agric. & Mech. Colleges*, 1995 WL 597257, at *1 (10th Cir. 1995) (unpublished) (stating that Title VI plaintiffs must prove "discrimination based upon a protected category and that the entity involved is receiving federal financial assistance").

Concerning the latter requirement, Title VI explicitly covers "a college, university, or other postsecondary institution, or a public system of higher education" that receives federal financial assistance. *Id.* § 2000d-4a. Here, the parties do not dispute that the University receives federal financial assistance and is subject to Title VI's antidiscrimination requirements.

To analyze whether the University has engaged in intentional discrimination based on a protected category, the court employs the burden-shifting framework outlined in *Texas Departmentt of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). As the Tenth Circuit summarized:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for [the adverse treatment]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

---

citing *Robinson* to permit a Title VI disparate impact claim brought under Section 1983, and such a cause of action has been thoroughly analyzed and rejected by multiple other courts of appeal. *See, e.g., S. Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 274 F.3d 771, 790 (3d Cir. 2001); *Wilson v. Collins*, 517 F.3d 421, 432 (6th Cir. 2008); *see also Save Our Valley v. Sound Transit*, 335 F.3d 932, 939 (9th Cir. 2003) (ruling broadly that "agency regulations cannot independently create rights enforceable through § 1983"). Because Plaintiff has not pled a Section 1983 claim presenting a Title VI disparate impact theory of liability, the court need not consider whether he may do so under *Sandoval*, *Robinson*, and the framework established in the *Maine v. Thiboutot* line of cases.

> discrimination. . . . The ultimate burden of persuading the trier of
> fact that the defendant intentionally discriminated against the
> plaintiff remains at all times with the plaintiff.

*Bryant v. Indep. Sch. Dist. No. I–38 of Garvin Cty., OK*, 334 F.3d 928, 929–30 (10th Cir. 2003)

(quoting *Burdine*, 450 U.S. at 252–53). For motions to dismiss in discrimination contexts, "the

[Rule] 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her

complaint," but "the elements of each alleged cause of action help to determine whether Plaintiff

has set forth a plausible claim." *Khalik*, 671 F.3d at 1191–92 (citing *Swierkiewicz v. Sorema N.A.*,

534 U.S. 506, 515 (2002)).

    To state a prima facie case of discrimination under Title VI, the plaintiff must show:

"(1) that he or she is a member of a protected class; (2) that he or she was disciplined; and (3) that

similarly situated comparators were treated differently for the same or similar conduct." *Buhendwa*

*v. Univ. of Colorado at Boulder*, 214 F. App'x 823, 828 (10th Cir. 2007) (unpublished) (citing

*MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005)). "Individuals are

considered 'similarly-situated' when they (1) have dealt with the same [officials]; (2) were

subjected to the same . . . standards; and (3) had engaged in the same conduct without such

differentiating or mitigating circumstances that would distinguish their conduct or the [official's]

treatment of them." *Id.* (citation omitted). Finally, for Title VI claims in the education context, a

plaintiff also "needs to demonstrate that an 'appropriate person' at the University, that is, someone

in a position to implement anti-discrimination measures, had actual notice of the alleged

discrimination and did not respond adequately." *Assenov v. Univ. of Utah*, 553 F. Supp. 2d 1319,

1335 (D. Utah 2008) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

    Plaintiff alleges that Defendants violated Title VI because: (1) the Department's

requirement that Plaintiff take and pass the qualifying examinations despite his prior education

and experience was discriminatory, *see* Am. Compl. ¶¶ 68, 70, and (2) "the way the Department administered the examinations" to require Plaintiff to handwrite his answers in English was discriminatory or made Plaintiff more susceptible to discriminatory biases, *see id.* ¶¶ 49, 71. Plaintiff has failed to state a Title VI violation on both claims because he has not set forth sufficient facts to plausibly allege that Defendants intentionally treated him differently from similarly-situated students in the Ph.D. program in any way, much less on account of a protected trait under Title VI.

### 1. Qualifying Examinations Requirement

Plaintiff fails to allege facts that could establish a prima facie case of discrimination concerning the qualifying examinations requirement. Plaintiff argues that the Department's mandate for all Ph.D. candidates to take and pass the qualifying examinations was a bad policy given Plaintiff's prior education and experience. *See* Am. Compl. ¶¶ 11, 65–68, 74.[4] But Plaintiff fails to plausibly allege that Defendants engaged in disparate treatment of Plaintiff by enforcing the requirement differently for his Ph.D. candidacy than the Department does for other similarly-situated students in the program. Instead, in reviewing Plaintiff's internal appeal, the Committee stated that "[t]he Economics Department has a clear set of requirements" concerning the qualifying examination that "are clearly stated, and consistently applied, including the policy that students who fail to pass comprehensive exams twice be dismissed from the program," and it was Plaintiff who was seeking a "departure from standard departmental requirements." ECF No. 20-6 at 2. Indeed, Plaintiff himself recognizes that the University "represented to [him] that it required *all*

---

[4] The court does not consider the prudence of requiring Ph.D. students in Plaintiff's position to take the qualifying examinations because the court must "'show great respect for the faculty's professional judgment' when review of a purely academic decision is involved." *Irwin*, 1995 WL 597257, at *1 (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)). Instead, the question before the court is whether Defendants required Plaintiff to take the examinations in a way that treated him differently from similarly-situated peers.

*students/candidates* in the Ph.D. program to score at least one pass and two marginals on the examinations" to advance in the Ph.D. program, *see* Am. Compl. ¶ 35 (emphasis added), and Plaintiff has not alleged that Defendants failed to apply the qualifying examination requirement evenly to all similarly-situated students in the program, *see, e.g.*, ECF No. 29 at 11.

The Tenth Circuit's analysis in *Buhendwa v. University of Colorado at Boulder* is instructive on this issue. *See* 214 F. App'x at 828. There, a college student who is "a native of the nation of Zaire and of African ethnicity" and whose "native language is Swahili" claimed that she received a failing grade in her undergraduate calculus class because of unlawful discrimination under Title VI. *Id.* at 824. The plaintiff argued that she established a prima facie case of discrimination because she alleged that other students in the class "were given an opportunity, not afforded to her, to take quizzes and examinations" in the professor's office, as well as other suspected accommodations. *Id.* at 827. The Tenth Circuit rejected the plaintiff's Title VI claim because she had "failed to demonstrate that she was treated differently from the [similarly situated, non-minority] students for the same conduct." *Id.* at 828. The court recognized that the plaintiff received a failing grade in calculus because she fell asleep during the final exam, and reasoned that she had failed to establish a prima facie case of discrimination because she had not shown that similarly-situated students received differential treatment for the same behavior. *Id.*

Similarly here, Plaintiff has not pled any facts suggesting differential treatment between him and other similarly-situated students concerning the qualifying examinations requirement and the consequences for failing to pass the exams. Although Plaintiff argues that he was generally treated in a discriminatory manner as a student in the Department—such as his allegation that the Department "welcomed" students of Asian descent and gave them preferential access to the CSBS computer lab, *see* Am. Compl. ¶¶ 26–27—that general claim of discrimination has no articulated

relation to the Department's requirements that Plaintiff pass the qualifying examinations and the consequences for his failure to do so. In other words, to plausibly state a claim under Title VI concerning the Department's qualifying examinations requirement, Plaintiff needed to have alleged facts showing that similarly-situated students in the Ph.D. program were either not required to take the examinations or were allowed to advance in the Ph.D. program despite failing the examinations. But Plaintiff has failed to make such allegations and appears instead to concede that the Department applied the qualifying examinations requirement to all Ph.D. students in the program. *See id.* ¶ 35. The court accordingly dismisses his Title VI claims.

### 2. Examination Handwriting and Language Requirement

Plaintiff also fails to allege facts that could establish a prima facie case of discrimination concerning the requirement that his answers to the qualifying examinations be handwritten in English. Plaintiff argues that the Department's administration of the examinations had a "disparate impact on [him] because his second language is English and having to handwrite answers in English had a disparately negative impact on him because of his race/national origin (African, native French speaker)." ECF No. 29 at 12. For support, Plaintiff cites the Supreme Court's opinion in *Lau v. Nichols*, which held that the failure of San Francisco's school system to accommodate "the Chinese-speaking minority" of students in its primary public schools violated Title VI because those students "receive[d] fewer benefits than the English-speaking majority" and were effectively "denie[d] . . . a meaningful opportunity to participate in the educational program." 414 U.S. 563, 568 (1974). Plaintiff argues that Defendants similarly violated Title VI because of the Department's alleged "failure . . . to provide methods of bridging the language gap and especially the language/handwriting gap" for Plaintiff on his exam answers. Am. Compl. ¶ 71.

Although language use is not a protected trait under Title VI and the court is aware of no case that "establishes a right to speak a foreign language at a public school," *Rubio v. Turner*

*Unified Sch. Dist. No. 202*, 453 F. Supp. 2d 1295, 1305 (D. Kan. 2006), the Tenth Circuit has

repeatedly recognized that "[l]anguage may be used as a covert basis for national origin

discrimination." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (alteration in

original) (quoting and adopting rule from *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980)).[5]

However, Plaintiff's reliance on *Lau v. Nichols* to claim that he was subjected to national origin

discrimination based on language is unavailing because the Supreme Court has "since rejected

*Lau's* interpretation of [Title VI]" in *Alexander v. Sandoval*. *See* 532 U.S. at 285.

Under *Sandoval*, instead of analyzing whether the Department's policy to have

examination answers handwritten in English resulted in a *disparate impact* on Plaintiff because of

his national origin, the court must determine whether the Department maintained or applied this

policy based on intentional *disparate treatment* discrimination. *See id.* at 280; *see also Ricci v.

DeStefano*, 557 U.S. 557, 577 (2009) (distinguishing disparate impact from disparate treatment in

the Title VII context).[6] Plaintiff concedes that his language-based claims rely on a disparate impact

---

[5] *See also Maldonado v. City of Altus*, 433 F.3d 1294, 1306 (10th Cir. 2006) (recognizing that the
EEOC has "concluded that an English-only policy . . . is likely in itself to 'create an atmosphere
of inferiority, isolation, and intimidation' that constitutes a 'discriminatory working environment'"
on the basis of national origin (quoting 29 C.F.R. § 1606.7(a))), *abrogated in part on other grounds
by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66–67 (2006).

[6] The Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development
Corporation* developed a framework for using evidence of a law's racially disparate impact as an
"important starting point" for examining discriminatory intent under an Equal Protection Clause
claim. 429 U.S. 252, 266 (1977). Essentially, *Arlington Heights* held that "[o]fficial action will not
be held unconstitutional solely because it results in a racially disproportionate impact," *id.* at 264–
65, but the court may find discriminatory intent from an action's disparate impact combined with
other circumstantial evidence of discrimination in the relevant "historical background," the
"specific sequence of events leading up to the challenged decision," "[d]epartures from the normal
procedural sequence," "[s]ubstantive departures . . . if the factors usually considered important by
the decisionmaker strongly favor a decision contrary to the one reached," and the "legislative or
administrative history" including any "contemporary statements" by relevant officials, *see id.* at
266–68. Although the Supreme Court in *Alexander v. Sandoval* does not mention the *Arlington
Heights* framework or explicitly extend it to Title VI discrimination claims, the Supreme Court has
recognized that the Equal Protection Clause analysis is coextensive with Title VI, at least in the

theory of national origin discrimination, *see* ECF No. 29 at 11–12, and he has otherwise failed to allege sufficient facts to plausibly plead that Defendants required him to handwrite his examination answers in English because of disparate treatment. Therefore, his Title VI claims on this basis are dismissed.

Relatedly, Plaintiff emphasizes that the Committee found a potential for bias in the Department's examination grading process, and argues that this potential amounts to a Title VI violation because it demonstrates that he experienced discrimination during the grading of his examinations. In addressing Plaintiff's academic appeal, the Committee stated that because Plaintiff's examinations had to be handwritten and his handwriting is unique, "those grading [his] examinations may have recognized his handwriting, and if they were biased against him, such awareness may have influenced their grading of his answers on the examinations." Am. Compl. ¶ 49. But even accepting the Committee's inference that the handwriting requirement exposed Plaintiff to a greater potential for grading bias, that does not obviate Plaintiff's burden to plausibly

---

academic context. *See Bakke*, 438 U.S. at 287 ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause."); *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (concluding that a Title VI claim "also fail[ed]" because "the Equal Protection Clause [did] not prohibit the Law School's narrowly tailored use of race in admissions decisions"). As a result, other courts of appeal (post-*Sandoval*) have applied the *Arlington Heights* framework to a Title VI claim, considering evidence of an action's disparate impact among other circumstantial factors. *See, e.g., Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 563–64 (3d Cir. 2002); *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 494 (6th Cir. 2014) (unpublished); *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 702–03 (9th Cir. 2009). But the court has found no Tenth Circuit decision applying *Arlington Heights*'s use of disparate impact evidence and searching analysis of other circumstantial factors in the Title VI context. Regardless, the court need not determine whether the *Arlington Heights* analysis is applicable here because Plaintiff has failed to state facts or raise any arguments under the other *Arlington Heights* circumstantial factors. *See Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1070 (10th Cir. 2002) (recognizing potential applicability of the *Arlington Heights* analysis in the Title VI context, but stating that it is the plaintiff's "burden to show discrimination, . . . and she did not provide the district court with any of this background information" under those factors).

14

allege that intentional discrimination affected the Department's grading of his qualifying examinations during the two instances in which he took the exams. *See Khalik*, 671 F.3d at 1193 ("[G]eneral assertions of discrimination . . . are insufficient to survive a motion to dismiss."). Stated differently, even if requiring Plaintiff to handwrite his answers in English heightened the potential for bias, Plaintiff has not alleged that the reviewers who graded his answers after his two attempts to pass the examinations actually connected his handwriting to him specifically, or to a protected trait, or in any other way graded his answers differently from the answers of Plaintiff's similarly-situated peers because of discriminatory bias. Therefore, any claim that Defendants violated Plaintiff's Title VI rights during the grading of his examinations is also dismissed.

In sum, the court holds that Plaintiff has failed to plead sufficient facts to plausibly allege that Defendants intentionally treated him differently from similarly-situated students in the Ph.D. program by requiring him to pass the qualifying examinations or in administering the examinations. Therefore, Plaintiff's Title VI claims of race, color, or national origin discrimination against all Defendants are dismissed.

## B.  SECTION 1983 CLAIMS

Plaintiff also pleads that his dismissal from the Ph.D. program violated his due process and equal protection rights under the Fourteenth Amendment. *See* Am. Compl. ¶¶ 72–77. Among other arguments,[7] Defendants contend that Plaintiff's Section 1983 claims should be dismissed because

---

[7] Defendants also argue: (1) the Eleventh Amendment's guarantee of state sovereign immunity bars Plaintiff's Section 1983 claims "against the University and President Watkins, Dean Berg, and Dr. Maloney in their official capacities;" and (2) Plaintiff's claims against President Watkins, Dean Berg, and Dr. Maloney in their individual capacities should "fail because he has not alleged personal participation by any of them in a specific constitutional violation." ECF No. 26 at 13. Because Plaintiff has failed to allege facts to state a plausible claim that Defendants violated his Fourteenth Amendment rights, the court does not address these arguments and dismisses Plaintiff's due process claims and equal protection claims against all Defendants.

the individual defendants are entitled to qualified immunity because no underlying constitutional violation occurred. *See* ECF No. 26 at 15–18.

The Tenth Circuit set forth the applicable standard in *Poolaw v. Marcantel*:

> When a defendant raises an affirmative defense of qualified immunity, the burden rests with the plaintiff to show that the defendant's actions fall outside the scope of the immunity. In determining whether the plaintiff has made that showing, the district court considers whether the facts taken in the light most favorable to the plaintiff show that the defendant's conduct violated a constitutional right. If that initial inquiry is satisfied, the court considers whether the right violated was clearly established.

565 F.3d 721, 728 (10th Cir. 2009).[8] At the first step, the court finds that the individual defendants are entitled to qualified immunity because Plaintiff has failed to plead sufficient facts to state a claim that he was deprived of his constitutional rights to due process or equal protection under the law. Because Plaintiff did not allege sufficient facts to plead a plausible claim of a due process or equal protection violation, the court also dismisses Plaintiff's Section 1983 equal protection and due process claims against the University.

### 1. Equal Protection Claim

Plaintiff alleges that the individual defendants "denied him the equal protection of the law" under the Fourteenth Amendment when they required him to take and pass the qualifying examinations, administered the examinations, and took part in dismissing him from the Ph.D. program because he failed the examinations. Am. Compl. ¶ 77. The Equal Protection Clause states that "[n]o State shall make or enforce any law which shall . . . deny to any person within its

---

[8] The Supreme Court established this two-step approach to analyzing qualified immunity in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court later recognized that the "two-step *Saucier* procedure is often, but not always, advantageous," so instead of making it mandatory, the Court left it to lower courts "to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). The court determines that the order of decisionmaking explicated in *Saucier* is best suited to address qualified immunity in this case.

jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 2. Similar to the Title VI discrimination standard, "[t]o assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were [intentionally] treated differently from others who were similarly situated to them." *Brown v. Montoya*, 662 F.3d 1152, 1172–73 (10th Cir. 2011) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998)).

As the court explained above, Plaintiff relies on a disparate impact theory of discrimination that alone does not demonstrate an Equal Protection Clause violation, and has otherwise failed to state facts to plausibly allege that Defendants treated him differently from similarly-situated peers concerning the qualifying examinations requirement and Defendants' administration of the examinations. Therefore, for the same reasons articulated in the court's resolution of Plaintiff's Title VI claims, Plaintiff's Equal Protection Clause claims are dismissed and the individual defendants are entitled to qualified immunity on this basis.

## 2. Due Process Claim

Finally, Plaintiff contends that "he had a liberty interest and property interest in his higher education and his desire to obtain a doctorate degree" and Defendants deprived him of these interests "without due process of law." Am. Compl. ¶¶ 73, 76. The Due Process Clause states that "[n]o State shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 2. "Courts follow a two-step inquiry to evaluate procedural due process claims: '(1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?'" *Assenov*, 553 F. Supp. 2d at 1327 (quoting *Kirkland v. St. Vrain Valley Sch. Dist. No. Re–1J*, 464 F.3d 1182, 1189 (10th Cir. 2006)). The court finds that Plaintiff had a protected interest to engage his rights to procedural due process, but he did not plausibly

allege that Defendants provided him with a constitutionally deficient level of process when he was dismissed from the Ph.D. program.

First, Plaintiff had a protected interest in his status as a student in the Ph.D. Economics program. "'[A]n individual's place in a post-secondary . . . program' can qualify as a protected interest." *Lee v. Guikema*, 645 F. App'x 780, 783 (10th Cir. 2016) (unpublished) (quoting *Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986)). Defendants do not contest in this case that Plaintiff had a "property interest in continued education." ECF No. 26 at 17. Therefore, the court recognizes Plaintiff's protected interest in continuing in the Ph.D. Economics program.

Second, the court must determine what process was due Plaintiff in these circumstances and whether he received that level of process when he was dismissed from the Ph.D. program. "When a school makes an ostensibly academic judgment about a student, the procedural requirements of the Due Process Clause are satisfied if the student is given prior notice of the deficiencies in his academic performance and if the challenged decision is 'careful and deliberate.'" *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir. 2001) (quoting *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85 (1978)). The "due process clause does not require that a student dismissed from a state [graduate school program] for academic reasons be given a hearing." *Trotter v. Regents of Univ. of New Mexico*, 219 F.3d 1179, 1185 (10th Cir. 2000). Rather, the applicable "standard is intentionally low and purposely leaves out a hearing requirement because courts are reluctant to interfere in the educational process or to second guess an educator's expert judgment on academic matters." *Assenov*, 553 F. Supp. 2d at 1328 (citing *Horowitz,* 435 U.S. at 88–90). But "the notion of judicial deference to academic decisions loses force when . . . the decisionmaker is 'accused of concealing

nonacademic or constitutionally impermissible reasons' for its action." *Gossett*, 245 F.3d at 1181 (quoting *Ewing*, 474 U.S. at 225).

Here, Plaintiff has failed to plausibly plead a procedural due process violation because, even construing the facts and inferences in Plaintiff's favor, the University gave Plaintiff sufficient notice and process to contest his dismissal. Concerning notice, the parties do not dispute that the Department notified Plaintiff in October 2015 that he was required to take three qualifying examinations in Political Economy, Macroeconomics, and Microeconomics, and "score at least one pass and two marginals" on the exams to remain a student in the Ph.D. program. *See* Am. Compl. ¶¶ 28, 34, 35.[9] Plaintiff's Amended Complaint acknowledges that he was aware of the qualifying examinations requirement and the consequences of noncompliance, given his repeated complaints filed with the University's OEO/AA after being notified that he had to pass the qualifying examinations to advance in the Ph.D. program. *See id.* ¶¶ 30, 32.

Concerning whether the University's process in dismissing Plaintiff shows that its decision was "careful and deliberate," *see Gossett*, 245 F.3d at 1181, the court concludes that the Defendants met this requirement by offering Plaintiff more process than the Constitution requires before he was dismissed from the Ph.D. program. Specifically:

- the Department allowed Plaintiff two opportunities to take the qualifying examinations, but he failed both times, *see* Am. Compl. ¶¶ 36, 69;
- the University evaluated and provided written findings addressing Plaintiff's multiple complaints to the University's OEO/AA that the qualifying examinations requirement was discriminatory, *see id.* ¶¶ 30, 32;
- Chair Maloney of the Department of Economics reviewed and denied Plaintiff's Petition for Continuation in the Ph.D. program after he failed the qualifying examinations, *see id.* ¶¶ 37–38;

---

[9] Although the parties do not discuss this fact in their memoranda, the court notes that the Committee also recognized in its written decision on Plaintiff's appeal that the qualifying examination requirement appears in the Department's handbook entitled "Policy on Standards of Academic Performance and Academic Conduct for the PhD Program in Economics." ECF No. 20-6 at 2.

- Plaintiff appealed to Dean Berg, who also considered and denied his request to retake his qualifying examinations or waive the requirement, *see id.* ¶¶ 39–40;
- Plaintiff appealed through a different channel to the CSBS Academic Appeals Committee, which held a hearing on the matter, took testimony from Plaintiff and Dr. Maloney, and provided written recommendations concerning Plaintiff's appeal, *see id.* ¶¶ 41–42;
- Dean Berg again considered Plaintiff's circumstances in light of the Committee's recommendations, but rejected offering him the chance to retake the qualifying examinations on the basis of purported discrimination because the University's OEO/AA had already investigated his claims of discrimination and determined that they were unfounded, *see id.* ¶ 51; and finally,
- Plaintiff appealed to then Senior Vice President for Academic Affairs Watkins, who also considered and rejected Plaintiff's appeal in a written response, *see id.* ¶¶ 56–57.

This process that Defendants provided to Plaintiff is similar to the process that the Tenth Circuit deemed constitutionally sufficient in *Dixon v. Regents of Univ. of New Mexico*, 242 F.3d 388, 2000 WL 1637557, at *4 (10th Cir. 2000) (unpublished). In *Dixon*, a medical school dismissed a graduate student from the program because of her unsatisfactory academic performance, including twice failing a final examination in Obstetrics Gynecology. *See id.* at *1–2. Considering this academic shortcoming as well as other "performance and behavioral problems," the medical school began to have "serious reservations about [the plaintiff's] ability" to succeed in her graduate studies. *Id.* Accordingly, the "Committee on Student Promotions and Evaluations" held a hearing "to discuss [the plaintiff's] performance problems and her potential dismissal from medical school." *Id.* at *2. At the hearing, the plaintiff "was not permitted to question witnesses or present witnesses of her own," but the Committee took testimony from "both [the plaintiff] and her therapist," who had helped her "manage . . . academic and interpersonal stressors" and "emotional difficulties." *Id.* at *1–2. After the hearing, the committee recommended that the plaintiff be dismissed because of the "totality of her poor academic performance." *Id.* at *2 (alterations omitted). The plaintiff appealed the committee's decision to a different review body, which concluded that although it "found fault with the way the Department of Obstetrics

Gynecology dealt with her final examination, it upheld the Committee's decision" to dismiss the plaintiff from the program. *Id.* The plaintiff appealed to the medical school Dean, who reviewed the plaintiff's academic record and upheld the decision to dismiss her from the program. *See id.* The Tenth Circuit held that the plaintiff "was accorded all the process required by the Fourteenth Amendment" because the "record reveals that she had the opportunity to present written evidence and make oral statements to the responsible university officials." *Id.* at *4.

The same conclusion applies in this case: Plaintiff had ample opportunity to present written evidence and make oral statements concerning the qualifying examinations requirement and his allegations of discrimination to the responsible decisionmakers before the University dismissed him from the Ph.D. Economics program. Indeed, as detailed above, Plaintiff presented his claims to five different reviewers or entities: the OEO/AA, Chair Maloney, the CSBS Committee, twice to Dean Berg, and to Senior Vice President Watkins. *See* Am. Compl. ¶¶ 30, 32, 37–42, 51, 56–57. Accordingly, Plaintiff has failed to state a plausible due process clause claim because, like the plaintiff in *Dixon*, he "was accorded all the process required by the Fourteenth Amendment" before he was deprived of his protected interest in continuing his graduate studies in the Ph.D. Economics program. *See* 2000 WL 1637557, at *4. Because Plaintiff has not plausibly stated a violation of his procedural due process rights, the individual defendants are entitled to qualified immunity and Plaintiff's Section 1983 claims on this basis are dismissed.

## C. DISMISSAL WITH PREJUDICE

In his Memorandum in Opposition, Plaintiff repeatedly requests that if the court dismiss his claims, it do so without prejudice. But Plaintiff has not requested leave to amend the Complaint. Nor has Plaintiff indicated any additional facts he could plead that would allow his claims to survive a Motion to Dismiss. Because he has made no showing that he could cure the

deficiencies in his pleading or that dismissal without prejudice is otherwise warranted, the court will not entertain Plaintiff's naked request to dismiss the claims without prejudice. The court therefore dismisses Plaintiff's claims with prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997)). *See also Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) (explaining that district courts "are within their discretion to dismiss with prejudice where a party does not [request leave to amend or suggest the ways in which it might cure defects with the complaint]" (citation omitted)).

## IV.    ORDER

For the foregoing reason, the court GRANTS Defendants' Motion to Dismiss. Specifically, the court orders:

1. Plaintiff's Title VI discrimination claims are dismissed against all Defendants;

2. Plaintiff's Fourteenth Amendment Equal Protection Clause claims under Section 1983 are dismissed against all Defendants; and

3. Plaintiff's Fourteenth Amendment Due Process Clause claims under Section 1983 are dismissed against all Defendants.

Signed November 23, 2020

BY THE COURT:

_____
Jill N. Parrish
United States District Court Judge

22